**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETS**

**Jane Doe (J.R.L), an individual,**

Plaintiff,

v.

**HILTON DOMESTIC OPERATING COMPANY INC.; HILTON DOMESTIC MANAGEMENT LLC; and CROSSTOWN CENTER HOTEL LLC d/b/a HAMPTON INN & SUITES,**

Defendants.

Civil Action No.

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (J.R.L), by and through the undersigned counsel, files this Original Complaint against HILTON DOMESTIC OPERATING COMPANY, INC.; HILTON DOMESTIC MANAGEMENT LLC; and CROSSTOWN CENTER HOTEL LLC d/b/a HAMPTON INN & SUITES as Defendants, and respectfully shows the Court as follows:

## SUMMARY

1.      Jane Doe (J.R.L) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.[1]

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a

---

[1] A Motion to Proceed Under Pseudonym was filed simultaneously with the filing of this Complaint.

commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[2]

3.    Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[3] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[4]

4.    Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[5] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[6]

5.    Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[7] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

6.    Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

---

[2] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[3] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[4] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[5] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[6] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).
[7] 18 U.S.C. §1591(e)(3).

7.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

8.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

9.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (J.R.L), with minimal risk of detection or interruption.

10.     Defendants continued supporting traffickers, including Jane Doe (J.R.L)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotel and specifically at the Hampton Inn & Suites located at 811Massachusetts Ave, Boston, MA 02119 (hereafter referred to as the "subject Hampton Inn"). Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## **PARTIES**

11.     Jane Doe (J.R.L) is a natural person who is currently a resident and citizen of Massachusetts.

12.     Jane Doe (J.R.L) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

3

13.     Hilton Domestic Operating Company Inc. is a Delaware corporation with its principal place of business in Virginia.  It may be served through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware, 19808.

14.     Hilton Domestic Management LLC is a Delaware limited liability company with its principal place of business in Virginia. It may be served through its registered agent Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware, 19808.

15.     Hilton Domestic Operating Company Inc. and Defendant Hilton Domestic Management LLC will be referred to collectively as "Hilton Defendants." At all relevant times, Hilton Defendants owned, operated, controlled, and managed the Hampton Inn & Suites located at 811Massachusetts Ave, Boston, MA 02119.

16.     All references to Hilton include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Hilton now or at any time relevant to the claims herein.

17.     Defendant Crosstown Center Hotel LLC d/b/a Hampton Inn & Suites is a Massachusetts limited liability company with its principal place of business in Boston, MA.  It may be served through its registered agent Corcoran Jennison Company Inc., 150 Mt. Vernon St, Suite 500, Boston, MA 02125. At all relevant times, Defendant Crosstown Center Hotel LLC d/b/a Hampton Inn & Suites owned, operated, controlled, and managed the Hampton Inn & Suites located at 811Massachusetts Ave, Boston, MA 02119.

18.     Defendant Crosstown Center Hotel LLC d/b/a Hampton Inn & Suites will be referred to as "Hampton Inn & Suites" or "Franchisee Defendant."

4

19.    In the event any parties are misnamed or not included herein, such event was a misnomer, or such parties are or were alter egos of parties named herein. Thus, Plaintiff Jane Doe (J.R.L.) brings suit against all partnerships, unincorporated associations, individuals, entities, and private corporations doing business under the assumed name of or including the words: Hilton Domestic Operating, Hilton Domestic Management, Hilton Domestic, and Hilton Management.

20.    Hilton Defendants and Franchisee Defendant will be referred to collectively as "Defendants."

## JURISDICTION & VENUE

21.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

23.    Venue is also proper in this Court pursuant to 20 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## STATEMENT OF FACTS

**I.    Jane Doe (J.R.L) is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

24.    Jane Doe (J.R.L) met her trafficker in 2010. Jane Doe (J.R.L) was introduced to a man at a gathering she attended. Jane Doe (J.R.L) did not have a place to stay at the time and the man offered her a place to stay having no reason or knowledge to suspect that she would be forced into sex trafficking. However, from May 2010 to December 2014 Jane Doe (J.R.L) was forced to engage in commercial sex acts numerous times a day by her trafficker who physically and mentally abusing her. Jane Doe (J.R.L) feared for her life.

25.    At various times between May 2010 to December 2014, Jane Doe (J.R.L) was continuously and unlawfully trafficked at the subject Hampton Inn. Jane Doe (J.R.L)'s trafficker set the prices for the commercial sex services he required her to provide, collected money directly from johns, and used financial dependence to coerce and manipulate Jane Doe (J.R.L) to perform commercial sex services for his financial benefit.

26.    Jane Doe (J.R.L)'s sexual exploitation repeatedly occurred in rooms of the subject Hampton Inn and was facilitated by the Hilton Defendants and Franchisee Defendant.

27.    There were obvious signs that Jane Doe (J.R.L) was being trafficked at the subject Hampton Inn such that the Hilton Defendants and Franchisee Defendant knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

28.    Jane Doe (J.R.L)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[8] These effects were obvious and apparent to the staff and management of the subject Hampton Inn including effects on (J.R.L)'s appearance, demeanor, movements throughout the hotel, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that (J.R.L) was being continually subjected to coercion, control, and exploitation.

## II.    The Hotel Industry's Role in Sex Trafficking and Hotel Defendants' Knowledge of the Problem.

29.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking at their hotel properties, the subject locations and the trafficking of Jane Doe (J.R.L).

---

[8] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

30.     Sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[10] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[11] Hotels have been found to account for over 90% of the commercial exploitation of children.[12]

31.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking

32.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[13]

---

[9] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id

[10] See Human Trafficking in the Hotel Industry, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; see also Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[11] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[12] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[13] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

33.      Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[14]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

---

[14] *See Id.*

34.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[15] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

35.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[16] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

36.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[17]

37.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and

---

[15] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[16] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[17] *Id.*

enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

38.    All Defendants were specifically aware that commercial sex in a hotel environment, involving a "pimp," implicitly involves to sex trafficking. Defendants received training and guidance on this. Defendants knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that reasonable diligence required treating signs of commercial sex activity, particularly with apparent and obvious involvement of a "pimp," as evidence of sex trafficking. Reasonable diligence required Defendants to avoid benefiting from the rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

39.    The most effective weapon against sexual exploitation and human trafficking is education and training.[18] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[19]

40.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[20] In reference to companies like the Defendants,

---

[18] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[19] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[20] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

41.    Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

42.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.

43.    Defendants' public statements regarding trafficking confirm they are aware of the problem in the hospitality industry. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, Franchisee Defendants, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

44.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

45.     Accordingly, many hotel chains—including the Hilton Defendants' hotels—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. For example:

    a.    As early as 2010, Chinese police found a brothel operating inside a Hilton branded hotel, which prompted Hilton Worldwide officials to publicly claim to be working a code of conduct to prevent child sex trafficking at their branded properties.[21]

    b.    Hilton Worldwide, on behalf of its brands including Embassy Suites, joined the ECPAT-USA Code in 2011, acknowledging its duties to prevent and protect children from trafficking after over a year of advocacy directed at Hilton branded properties anti-trafficking advocates.[22]

    c.    Speaking on behalf of its brand, Hilton Worldwide stated in 2013: "Sex trafficking and sexual tourism is a large and growing problem worldwide, and Hilton Worldwide must never allow any of its properties, products, or services to be used in a manner that supports or enables any form of abuse and exploitation."[23]

    d.    In 2015, Hilton Worldwide conducted a global human rights assessment for all its branded properties, which identified the following risk: hotels may be used by criminals to traffic victims for exploitation.[24]

46.     At all relevant times, the Hilton Defendants adopted a centralized approach to trafficking-related issues at all Hilton branded properties, including the Subject Hampton Inn. This has included maintaining centralized policies on detecting and response to trafficking, exercising centralized control over training related to sex trafficking, adopting centralized practices for reporting, and centralized monitoring and assessment of anti-trafficking efforts. Hilton also acted

---

[21] https://www.nasdaq.com/articles/hilton-working-abolsish-child-sex-trafficking-2010-11-03
[22] https:stopchildlaROrorg/Hilton-signs-code-of-conduct-to-prevent-child-prostitution/
[23] https://thecode.my.salesforce-site.com/apex/publicPdf?id=0019000000GxgQIAAAZ&year=2013
[24] https://esg.hilton.com/wp-content/uploads/sites/3/2002/08/Hilton-FY-2021-Modern -Slavery-Act-Statement-1.pdf

on behalf of all Hilton properties when communicating and partnering with external entities dedicated to eradicating sex trafficking in the hotel industry.

47.     Unfortunately, Defendants' promises have proved empty time and again. While Defendants' statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and receiving benefits from that trafficking. Defendants have made the choice, at all levels, to respond inadequately to their knowledge regarding sex trafficking in their hotels. Instead, Defendants have actively chosen to continue to benefit from sex trafficking of victims like (J.R.L)

### III.    Sex Trafficking Has Long Been Prevalent at Hilton Hotels, and Hilton Defendants Has Known About It.

48.     Hilton Defendants' knowledge is *not* limited to general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants have known, since well before Jane Doe (J.R.L)'s trafficking, that sex trafficking was ongoing and widespread at its properties.

#### A. Sex Trafficking at Hilton Branded Hotels was well Known by Hilton Defendants.

49.     The use of Hilton hotels, including Hampton Inn properties, for sex trafficking is well known to the Hilton Defendants. The Hilton Defendants has known for years that pimps and traffickers use their hotels to carry out their crimes.  Scores of news stories dating back for over a decade highlight Defendants' knowledge of such conduct. Hilton Defendants, knew, or should have known, of the use of Hampton Inn branded hotels for sex trafficking ventures. Dating back to dates prior to the sex trafficking of Plaintiff and continuing thereafter, are notable complaints that put the Hilton Defendants on notice of the frequent use of Hampton Inn hotels including the Subject Hampton Inn for commercial sex and other associated illegal activity.

50.    Upon information and belief, Hilton monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories and online reviews confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Hilton branded hotels, including:

- In 2007 an employee of a Hampton Inn in Minnesota used the hotel for trafficking of minors, posting online advertisement to draw customers to the hotel to exploit teenagers.[25]

- In 2011, a man was arrested after posting an online advertisement for commercial sex services to be provided by a minor trafficking victim at a Hampton Inn in Washington and was found to have made more than $192,000.00 as a pimp over a period of eight months.[26]

- A 2009 review of a Hilton branded property in New York noted that the hotel bar was used by prostitutes to pick up guests, that this could be spotted from a mile off, and that the hotel staff allowed it.[27]

- A 2010 review of a Hilton property in New York stated "It's true what other reviewers have commented on regarding prostitutes/escorts in the hotel bars. If you are paying attention you will be able to pick them out. we sat right next to a table one night when this was going on. the staff didn't seem to care. It's too bad because there were families in the bar also."[28]

- In 2011, a man was convicted of sex trafficking a minor at a Hilton branded hotel in Minnesota.[29]

- In 2011, a prostitute was raped when two men forced their way into her room at a Hilton branded property in New Hampshire.

- In 2012, a man was charged with sex trafficking at another Hilton branded hotel in Minnesota.[30]

- In 2012, a couple was charged with sex trafficking an 18-year-old girl with Autism

---

[25] Frederick Melo, *Burnsville / Sex ring sold high school 'party girls' on craigslist*, Twin Cities.com (July 12, 2007), https://www.twincities.com/2007/07/12/burnsville-sex-ring-sold-high-school-party-girls-on-craigslist/
[26] Steve Hunter, *Man reportedly made at least $192,000 in 8 months from prostitutes in Kent*, Seattle, Kent Reporter (Sept. 7, 2011), https://www.kentreporter.com/news/man-reportedly-made-at-least-192000-in-8-months-from-prostitutes-in-kent-seattle/
[27] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html
[28] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html
[29] https://www.startribune.com/28-years-for-man-who-used-girl-for-prostitution/118163089/
[30] https://www.startribune.com/fridley-man-st-paul-woman-accused-of-prostituting-iowa-teen/138615249/

14

Spectrum Disorder at a Hilton branded property.[31]

- In 2012, a man was charged with forced labor and sex trafficking following a sting at a Hilton branded hotel in California.[32]

- In 2012, arrests were made after police conducted a prostitution sting operation at a Hilton branded property in Memphis.[33]

- In 2013, eight arrests were made after several law enforcement response for prostitution activity at a Hampton Inn in Pennsylvania.[34]

- A 2013 review of a Hilton property in New York stated "But the prostitution going on in the lobby bar is so obvious The Waldorf must endorse it. Shame on you!"[35]

- In 2013, a man was charged with forcing a woman into prostitution at a Hilton property in Florida.[36]

- In 2014, a sex trafficking victim was found murdered at a Hilton property in Oregon.[37]

51.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Hilton branded hotels. Moreover, on information and belief, the Hilton Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media

52.    Upon information and belief, the Hilton Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the subject Hampton Inn where (J.R.L) was trafficked.

---

[31] https://www.twincities.com/2012/02/01/couple-charged-with-prostituting-runaway-iowa-girl-with-asperger-syndrome/
[32] https://www.nbclosangeles.com/news/local/long-beach-roshaun-kevin-nakia-porter-accused-human-trafficking-orange-county-pimp/1951757/
[33] https://www.actionnews5.com/story/20142585/suspected-prostitutes-busted-at-beale-area-hotel/
[34] Bryan Horwath, *8 arrests in prostitution sting: 4 Dickinson residents among those booked*, The Dickinson Press (Jan. 7, 2013), https://www.thedickinsonpress.com/news/8-arrests-in-prostitution-sting-4-dickinson-residents-among-those-booked.
[35] https://www.tripadvisor.com/Hotel_Review-g60763-d93618-Reviews-Waldorf_Astoria_New_York-New_York_City_New_York.html
[36] https://www.nbcmiami.com/news/local/broward-judge-sets-30000-bond-for-man-charged-with-human-trafficking/1923493/
[37] https://www.krem.com/article/news/nation/sex-trafficking-victim-found-slain-in-portland-hotel/293-157195643

53. Upon information and belief, at the time Jane Doe (J.R.L) was trafficked at the Subject Hampton Inn, Hilton knew at least the following:

    a. The use of Hilton properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b. Commercial sex work occurring at its properties involved trafficking and compelled prostitution;

    c. Franchisee Defendant and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Hilton hotel properties;

    d. Its efforts, if any, to stop facilitating sex trafficking in Hilton properties were not effective; and

    e. Its policies and practices were facilitating sex trafficking by creating an environment conducive to sex trafficking where widespread and ongoing sex trafficking would continue to occur.

**IV.    Jane Doe (J.R.L)'s Sex Trafficking at the Subject Hampton Inn.**

54. Between May 2010 to December 2014, Jane Doe (J.R.L)'s trafficker repeatedly brought her to the Subject Hampton Inn where they forced her to perform commercial sex services for his financial benefit. Jane Doe (J.R.L)'s trafficker intentionally selected this hotel location, which they used to traffic both Jane Doe (J.R.L) and other victims, as a desirable site for his sex trafficking operation.

**A. The Hilton Defendants and Franchisee Defendant had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hampton Inn.**

55. The Hilton Defendants and Franchisee Defendant were also specifically aware that sex trafficking was prevalent at the Subject Hampton Inn.

56. The Hilton Defendants and Franchisee Defendant knew that the Subject Hampton Inn was in a high-crime area with a known history of reports of sex trafficking.

57.    Online reviews of the Subject Hampton Inn hotel, which upon information and belief were monitored by the Hilton Defendants and Franchisee Defendant establish the nature of the role the subject Hampton Inn serves as a venue for sex trafficking. For example:

a.    A 2010 TripAdvisor review from the Subject Hampton Inn & Suites states: "…The room is fine, clean, we have an upper floor room, so not much siren noise (we are next door to an ER after all) and happy with our room. Didn't think much of the prostitutes (at least they appeared to be such to me and my husband) in the bar or the music, but, I guess it's what the locals prefer. NOT a nice neighborhood, but, we stayed for the rate, and not to be walking around the area at night anyway…"[38]

b.    A 2011 TripAdvisor review from the Subject Hampton Inn & Suites states: "…The staff is courteous. However, the neighborhood is bad. Lots of vagrants, druggies and deranged people wandering around. The bus and train are nearby but you have to be aware at all times. Nice hotel but we wouldn't stay there again…"[39]

c.    A 2013 TripAdvisor review from the Subject Hampton Inn & Suites states "…The bad points - location - it costs $10 to get a taxi to the city centre, the area is not great and a fellow guest saw drug deals happening outside, the constant wailing of sirens and lastly (with the exception of one lady), the sour disinterested looks on the faces of the female receptionists. They really let down the hotel.""[40]

d.    A 2014 TripAdvisor review from the Subject Hampton Inn & Suites states: "Stayed here two nights after staying at the Copley Marriott. It's like comparing apples to oranges, however as a Hilton Diamond member, I've stayed in all sorts of Hilton hotels. This one is to be avoided! The constant sirens from police/ambulances kept us up at all hours. Forget about walking anywhere; you will have to navigate a maze of some of societies less fortunate members. Homeless, drug addicts, and folks with all manners of face/neck tattoos…"[41]

e.    A 2014 TripAdvisor review from the Subject Hampton Inn & Suites states: "The hotel was clean and the staff friendly and the room was tidy and comfortable. Complimentary breakfast was nutritous and filling and appreciated. The outside of the hotel was another matter altogether. Homeless, Vagrants, and Pan-Handlers as well as what looked like Drugies and drug dealers near the premisis. My wife and

---

[38] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[39] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-
ReviewsHampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[40] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[41] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html

I did not feel safe and although the car was in a parking garage we worried about its safety as well."[42]

f.  A 2014 TripAdvisor review from the Subject Hampton Inn & Suites states: "…If you scour the Trip Advisor reviews carefully, there are many reviews which state homeless outside hotel, panhandling outside, "less than desirable location" and drug deals hotel…"[43]

g.  A 2015 TripAdvisor review from the Subject Hampton Inn & Suites states: "…he outside...forget walking anywhere. You will walk through panhandlers, homeless, prostitutes, drug addicts, and drinks. If you drive anywhere, lock your doors and keep your windows up. The panhandlers do not sit at the intersections in hopes of change to be tossed their way. They have an aggressive system of apoching cars while stopped at the lights. One person for each direction of traffic. This happens 24/hrs a day. Temperature and elements are not an issue…"[44]

h.  A 2015 TripAdvisor review from the Subject Hampton Inn & Suites states: "…This hotel is directly besides a homeless shelter and substance abuse center. This means you are surrounded by drug addicts and homeless people and hookers, especially scary at night. And I don't scare easily and have lived in the city for years. With everything going on with this hotel, it should go for $50 a night and then even then, buyer beware."[45]

i.  A 2016 TripAdvisor review from the Subject Hampton Inn & Suites states: "he front desk staff is rude. The location is in an unsafe area. So unsafe, that the hotel keeps the doors locked 16 hours a day and there is posted signage about this. Never have I stayed at a property where the doors are locked for 16 hours a day but once you walk outside you know why. Meth heads and other addicts, pimps, dealers and prostitutes are loitering outside the front doors. Hotel has no security. Plan on taking a taxi or uber everywhere for your own safety day or night…"[46]

j.  A 2016 TripAdvisor review from the Subject Hampton Inn & Suites states: "I paid over $250 to stay for a conference. The staff was friendly and the the hotel was clean but the neighborhood felt extremely unsafe with homeless people, drug addicts and prostitutes lingering around the hotel. day and night No walkability at all especially not to downtown or convention center, very disappointing."[47]

---

[42] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[43] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[44] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[45] https://www.yelp.com/biz/hampton-inn-and-suites-boston-crosstown-center-boston
[46] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html
[47] https://www.tripadvisor.com/Hotel_Review-g60745-d320038-Reviews-
Hampton_Inn_Suites_Boston_Crosstown_Center-Boston_Massachusetts.html

      k.   A 2018 TripAdvisor review from the Subject Hampton Inn & Suites states: "…he hotel is adjacent to a trauma center hospital. Think New York City in the 1990s… ambulances sirens screaming in and out all night long. my room had a nice view of the helipad on the hospital and the 30 or so drugged out prostitutes across the street in the parking lot being guarded by pimps and the steady flow of traffic picking them up and dropping them off…"[48]

58.    The Defendants knew or should have known about the sex trafficking pervasive at the Subject Hampton Inn on obvious indicators of this activity.

59.    Based upon information and belief, a population of traffickers, including Jane Doe (J.R.L)'s trafficker and other sex traffickers, had routinely used the Subject Hampton Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents.

60.    At the Subject Hampton Inn, traffickers, including Jane Doe (J.R.L)'s trafficker, operated with little regard for concealment, due to an implicit understanding between traffickers and Defendants. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

61.    There were other victims being trafficked at the Subject Hampton Inn at the same time as Jane Doe Jane Doe (J.R.L) and there were obvious signs these victims were being trafficked.

62.    The conduct of Franchisee Defendant and Hilton Defendants facilitated trafficking of a number of victims by a population consisting of multiple traffickers at the Subject Hampton Inn. Franchisee Defendant and Hilton developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

---

[48] https://www.yelp.com/biz/hampton-inn-and-suites-boston-crosstown-center-boston

63.    Upon information and belief, there were multiple trafficking victims exploited at the Subject Hampton Inn prior to Jane Doe Jane Doe (J.R.L)'s trafficking who exhibited obvious "red flags" of trafficking matching industry-recognized signs. These obvious "red flags" were observed by hotel staff and management, including high volumes of men who were not registered guests in and out of their room at unusual times, requesting clean towels and sheets frequently, wearing provocative clothing, obviously under the influence of drugs, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided Defendants with notice that these victims were being subject to violence, coercion, control, and exploitation.

64.    All knowledge from the staff at the Subject Hampton Inn is imputed to Defendants who knew about this widespread and ongoing trafficking at the Subject Hampton Inn, including the trafficking of Jane Doe (J.R.L), through the direct observations of hotel staff, including management-level staff.

65.    Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Franchisee Defendant knew or should have known about the widespread trafficking at the Subject Hampton Inn based on non-public sources of information including but not limited to:

    a.    surveillance of the property;

    b.    internal investigations;

    c.    customer complaints;

    d.   monitoring of customer feedback;

    e.   information received from law enforcement; and

    f.   other sources of non-public information available to Franchisee Defendant.

66.    Franchisee Defendant knew about or was willfully blind to the ongoing trafficking at the Subject Hampton Inn.

67.    At all material times, Hilton had robust reporting requirements in place for its hotels, including Franchisee Defendant.

68.    Hilton required Franchisee Defendant to report all suspected instances of crime, including sex trafficking, at the Subject Hampton Inn.

69.    Hilton regularly received reports from Franchisee Defendant and others related to suspected instances of crime, including sex trafficking, at the Subject Hampton Inn.

70.    Hilton required Franchisee Defendant to allow Hilton to regularly inspect the Subject Hampton Inn. Upon information and belief, during these inspections Hilton observed obvious signs of ongoing criminal activity, including red flags of sex trafficking activity.

71.    Upon information and belief, the Hilton Defendants knew or should have known about the widespread trafficking at the Subject Hampton Inn based on:

    a.   The obligation of hotel staff and Franchisee Defendant to report suspected criminal activity, including sex trafficking, to Hilton;

    b.   Hilton's regular monitoring of online reviews;

    c.   Hilton's collection and monitoring of customer surveys and complaints;

    d.   Hilton's requirement that Franchisee Defendant submit regular and detailed reports to Hilton about day-to-day hotel operations;

e.   Hilton's collection and monitoring of data about guests at the Subject Hampton Inn, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.   Hilton's supervision and control over day-to-day operations of the Subject Hampton Inn through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use and through which Franchisee Defendant was obligated to allow Hilton to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.   Hilton's regular inspections of the Subject Hampton Inn;

h.   Hilton's employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.   Hilton's access to surveillance and security systems;

j.   Information provided to Hilton by law enforcement; and

k.   Other sources of information available to Hilton.

72.    Upon information and belief, under the Hilton Defendants' protocols, which on their face required hotel staff to report suspected criminal activity to the Hilton Defendants, hotel staff and management were required to report instances of suspected sex trafficking to the Hilton Defendants prior to (J.R.L)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Hampton Inn.

73.    Upon information and belief, the Hilton Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Hampton Inn based on their supervision and monitoring of the property.

74.    Hilton and Franchisee Defendant had constructive knowledge of the widespread and ongoing trafficking at the Subject Hampton Inn because this trafficking resulted from their failure to exercise ordinary care operating the hotel. Specifically, Hilton and Franchisee Defendant each failed to detect sex trafficking that would have been detectable had the exercised ordinary

diligence in response to their knowledge of the problem of sex trafficking in their operations and in response to the obvious red flags of sex trafficking at the Subject Hampton Inn.

75.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hilton-branded hotels, and at the Subject Hampton Inn, Hilton Defendants and Franchisee Defendant each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject Hampton Inn and to make a reasonable investigation in response to signs of potential sex trafficking. If Hilton and Franchisee Defendant had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the Subject Hampton Inn and that they were benefiting from such trafficking.

76.     Hilton Defendants knew or should have known that this widespread and ongoing trafficking at the Subject Hampton Inn was the result of its policies and procedures and that, by continuing its operations, it would continue to facilitate widespread sex trafficking at this hotel.

## B. Defendants knew Jane Doe (J.R.L.) was being trafficked at the Subject Hampton Inn because of the apparent and obvious "red flags" of sex trafficking.

77.     During the period that Jane Doe (J.R.L.) was trafficked at the Subject Hampton Inn, there were obvious signs that her traffickers were engaged in sex trafficking:

a.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b.  Other girls were trafficked at the same hotel at the same time as Jane Doe (J.R.L.);

c.  Even though Jane Doe (J.R.L.) and her trafficker would stay for multiple days at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

d.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

e.  The trafficker was often present with Jane Doe (J.R.L.) at check in and would linger around the hotel or in the parking lot while she was with a john;

23

     f.    There was heavy foot traffic in and out of Jane Doe (J.R.L.)'s room involving men who were not hotel guests;

     g.    The hotel management and/or staff knew Jane Doe (J.R.L.) as a regular and allowed her and/or her trafficker to have any room they wanted catering to their needs;

     h.    Jane Doe (J.R.L.) had at least ten (5) johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

     i.    Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

78.    At the relevant time, it was well known in the hotel industry that these specific "red flags" associated with Jane Doe (J.R.L)'s trafficking at the Subject Hampton Inn were common indicators of sex trafficking. Franchisee Defendant and the Hilton Defendants had been trained and educated about this and, therefore, knew that such signs were highly suggestive of sex trafficking.

79.    Based upon information and belief, and their familiarity with Jane Doe (J.R.L) and her trafficker, multiple employees at the Subject Red Roof Inn, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment. Hotel staff and Franchisee Defendant knew about or were willfully blind to Jane Doe (J.R.L.)'s trafficking at the Subject Hampton Inn.

80.    Knowledge of Jane Doe (J.R.L.)'s trafficking is imputed to Hilton Defendants because Franchisee Defendant and the hotel staff were the Hilton Defendants' agents and subagents.

81.    Given the obvious signs of Jane Doe (J.R.L)'s trafficking, Franchisee Defendant and the hotel staff were required to report suspicion of Jane Doe (J.R.L)'s trafficking to Hilton.

82.     Hilton Defendants knew or had reason to know about Jane Doe (J.R.L)'s trafficking based on the numerous tools that it used to supervise the hotel.

83.     Hilton Defendants and Franchisee Defendant are charged with constructive knowledge of Jane Doe (J.R.L)'s trafficking at the Subject Hampton Inn because, had they exercised ordinary diligence, they would have detected this trafficking. This trafficking was known or (with the exercise of reasonable diligence) knowable to Hilton Defendants and Franchisee Defendant. Had Franchisee Defendant and Hilton followed reasonable industry practices, Jane Doe (J.R.L)'s trafficking would have been detected.

84.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Hilton hotels, and at the Subject Hampton Inn specifically, Franchisee Defendant and Hilton Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If Defendants had used reasonable prudence, they would have been aware that they were benefiting from Jane Doe (J.R.L)'s trafficking.

**C. Defendant Crosstown Center Hotel LLC d/b/a Hampton Inn & Suites facilitated the trafficking activity at the Subject Hampton Inn, that resulted in the trafficking of Jane Doe (J.R.L).**

85.     Franchisee Defendant had both actual and constructive knowledge of the trafficking of Jane Doe (J.R.L) at the Subject Hampton Inn because the trafficking was the direct result of Defendants facilitating her trafficking at the property.

86.     Franchisee Defendant is responsible for the acts, omissions, and knowledge of all employees of the Subject Hampton Inn when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with

regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendant, of human trafficking at the Subject Hampton Inn.

87.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hampton Inn, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Jane Doe (J.R.L)

88.    Franchisee Defendant knew or was willfully blind to the fact that Jane Doe (J.R.L) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (J.R.L)'s sexual exploitation.

89.    Franchisee Defendant also facilitated widespread trafficking at the Subject Hampton Inn, including the trafficking of Jane Doe (J.R.L), in ways including:

   a.   Developing relationships with traffickers and creating an understanding that these traffickers could operate at the hotel without risk of interference.

   b.   Continuing to provide wi-fi services to traffickers even though it knew or should have known those services were being used for advertising victims for sexual exploitation.

   c.   Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   d.   Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   e.   Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

   f.   Continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of Jane Doe (J.R.L) and other victims.

   g.   Accommodating specific requests made by traffickers.

h. Failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site.

90. Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (J.R.L).

91. Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

92. Policies purportedly enacted and enforced by Hilton Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Hampton Inn by either Hilton Defendants or Franchisee Defendant, Jane Doe (J.R.L)'s trafficker was able to continue the trafficking venture at the Subject Hampton Inn. Had the Hilton Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their Hampton Inn branded hotels after observing an obvious sign of trafficking as described above, Jane Doe (J.R.L)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Hampton Inn.  Furthermore, had Franchisee Defendant properly followed the franchise policies enacted by Hilton to identify and prevent trafficking from occurring at Hampton Inn branded hotels as described above, Jane Doe (J.R.L)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Subject Hampton Inn.

**D. Hilton Defendants facilitated the trafficking activity at the Subject Hampton Inn, that resulted in the trafficking of Jane Doe (J.R.L).**

93. Hilton Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Hampton Inn. Upon information and belief, Hilton Defendants

directly participated in and retained day-to-day control over renting rooms at the Subject Hampton

Inn by, in ways including:

    a.   Hilton Defendants controlled all details of the guest reservation, check-in, and payment processes through both its management and control over all systems used for those processes and its adoption of detailed and specific policies governing the means and methods hotel staff used for each of these processes.

    b.   Hilton Defendants directly made reservations for rooms at the Subject Hampton Inn and accepted payment for those rooms through a central reservation system that it controlled and operated.

    c.   Hilton Defendants controlled extension of existing room reservations and guests had to contact Hilton Defendants to extend reservations.

    d.   Hilton Defendants controlled the payment methods that would be accepted and had access to information about which guests used which payment methods through its backend access to the reservation and payment systems.

    e.   Hilton Defendants controlled policies and protocols for guest identity verification at the time of check in and retained control over guest identity information.

    f.   Hilton Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

    g.   Hilton Defendants controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

    h.   Hilton Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Hampton Inn, including the following categories of information: name, contact information (mailing address, email address, phone number), nationality, date of birth, gender, payment card information, Hilton Honors number, passport information, preferred language, room preference, room selection and assignment, arrival time, additional guest names, corporate travel planner contact information (name, title, company, business phone, email and address), corporate number and name, travel agent number and name, airline partner number and name, vehicle information, images or footage captured by closed circuit television (CCTV), internet or other electronic network activity information, including information regarding a customer's interaction with Hilton websites, applications, or advertisements, IP addresses, Session IDs, Booking engine, Whether a customer has a Hilton and American Express co-branded credit card, whether a customer's Hilton and Amazon accounts are linked, whether a customer's Hilton and Lyft accounts are linked, geolocation information, device information, social media information, demographics data, a customer's usability preferences regarding Hilton's website (such as a customer's email preferences, MyWay preferences, and opt-out preferences), description of a

complaint that a customer makes to Hilton, including a customer's free form textual feedback if the customer is a Hilton Honors member, customer ratings and survey responses, and free form textual feedback.[49]

i.   Hilton Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Hampton Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

j.   Hilton Defendants required the Subject Hampton Inn to use their property management system, which was owned, maintained, controlled, and operated by Hilton, for virtually all aspects of hotel operations regarding room reservations and payment.

94.   Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hampton Inn, Hilton Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit Jane Doe (J.R.L).

95.   Hilton Defendants knew or should have known that Jane Doe (J.R.L) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them, for financial gain, hotel rooms and related services to facilitate Jane Doe (J.R.L)'s sexual exploitation.

96.   Hilton Defendants rented rooms in a way that it knew or should have known facilitated rental and use of those rooms by sex traffickers, including Jane Doe (J.R.L)'s traffickers.

97.   Hilton Defendants retained control over the details and methods of aspects of the operation of the Subject Hampton Inn that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, Hilton Defendants participated in a venture with sex traffickers who were using the Subject Hampton Inn as a venue for their trafficking. Moreover, as a result of this retained control, Hilton Defendants

---

[49] https://www.hilton.com/en/p/global-privacy-statement/

had both the opportunity and the duty to prevent Jane Doe (J.R.L)'s trafficking. Hilton directly

participated in and retained control over specific aspects of the operation of the Subject Hampton

Inn related to trafficking by:

a. assuming joint responsibility with Franchisee Defendant for detecting and preventing human trafficking at the hotel property;

b. directing, assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to Hilton;

c. directing, assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

d. directing, assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

e. employing field-based associates who work with hotels on trafficking issues;

f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for guests to report criminal activity and hotel security issues to franchisor;

h. retaining control over the security of the Subject Hampton Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Subject Hampton Inn;

i. retaining control over property-specific data and customer data, , including names, payment information, reservation history, browsing data, and other details associated with their stay, from the Subject Hampton Inn —which they obtained by controlling the means and methods by which Franchisee Defendant recorded, stored, and reported that data—such that they had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Subject Hampton Inn during the time Plaintiff was trafficked there;

j. requiring Franchisee Defendant to provide Wi-Fi/internet access to guests;

k. mandating the specific tools and systems that Franchisee Defendant must use to provide Wi-Fi/internet access to guests;

l. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

m.  requiring Franchisee Defendant to use a system to monitor and track housekeeping requests;

n.  setting policies for when and how housekeeping services are provided; and

o.  collecting and monitoring data that shows patterns of use of housekeeping services.

98.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hampton Inn, Hilton Defendants continued participating in a venture at that hotel, with their hotel staff, in a way that Hilton knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a.  While Hilton publicly committed to the EPCAT Code in 2011, they unreasonably delayed and failed to take any significant steps to implement that commitment for several years.[50]

b.  Hilton adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining Franchisee Defendant and front-line hotel staff regarding issues related to human trafficking.

c.  Hilton delayed implementation of anti-trafficking training. While Hilton Worldwide committed to the EPCAT Code in 2011, it had completed no training in 2011 and 2012 and had only trained 879 individuals, across all its brands, by the time of its 2013 report.[51]

d.  Hilton implicitly condoned and endorsed its staff's repeated decisions not to report or respond to trafficking appropriately.

e.  Hilton ignored policies that they had purportedly enacted and implemented.

f.  Hilton continued to implement and rely on policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Hampton Inn.

g.  Despite having specific knowledge of policies that would significantly reduce sex trafficking at the Subject Hampton Inn, Hilton declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or draw negative public attention by acknowledging the ongoing sex trafficking at Hilton properties.

---

[50] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2012;
https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013
[51] https://thecode.my.salesforce-sites.com/apex/publicPdf?id=0019000000GxgQIAAZ&year=2013

h.   Hilton attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

i.   Hilton allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability.

j.   Hilton adopted and required their staff to adopt check in procedures that failed to ensure all hotel guests were appropriately identified and, instead, allowed guests to use the hotel with minimal risk of traceability.

k.   Hilton continued to allow the Subject Hampton Inn to profit by using brand trademarks despite actual or constructive knowledge of ongoing sex trafficking in that hotel. Lending the perceived legitimacy its brand affirmatively facilitated sex trafficking by providing a venue where sex trafficking could occur with minimal risk of detection by law enforcement or traceability.

l.   Hilton provided traffickers with access to internet services that Hilton knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

99.   If Hilton Defendants had exercised reasonable diligence when operating the Hilton properties and in the areas where it retained control, Hilton Defendants would have prevented the Hilton properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.R.L). Instead, Hilton Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.R.L).

100.   The Hilton Defendants should have known about Jane Doe (J.R.L)'s trafficking because it retained control over the training of the staff of the Subject Hampton Inn regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If the Hilton Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of (J.R.L) at the Subject Hampton Inn. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Defendants.

101.    The Hilton Defendants should have known about (J.R.L)'s trafficking because they also retained control over the response of Hilton hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Hilton Defendants facilitated sex trafficking, including the sex trafficking of (J.R.L) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Defendants.

102.    The Hilton Defendants also should have known about (J.R.L)'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including Subject Hampton Inn, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Hampton Inn. The Hilton Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including (J.R.L). Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Defendants.

103.    The Hilton Defendants also should have known about (J.R.L)'s trafficking because they retained control over the security of the Subject Hampton Inn through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Subject Hampton Inn. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Hilton Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Hilton Defendants.

104.    Jane Doe (J.R.L) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Hilton Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

105.    Moreover, Jane Doe (J.R.L)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Hampton Inn over an extended period because the Hilton Defendants adopted policies and practices that insulated (J.R.L)'s trafficker from significant risk of detection or disruption.

106.    The Hilton Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (J.R.L).

107.    The Hilton Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## V.    Defendants' benefit from ventures at the Subject Hampton Inn.

108.    Each of the Defendants knowingly received benefits from participating in the ventures that facilitated trafficking, including Jane Doe (J.R.L)'s trafficking, at the Subject Hampton Inn. Each Defendant directly benefited from facilitating trafficking at the Subject Hampton Inn. Each Defendant received monetary payment as the result of the rental of rooms at the Subject Hampton Inn, including the rooms where Jane Doe (J.R.L) was being trafficked.

109.    The Hilton Defendants and Franchisee Defendant profited from every stay by every patron at the Subject Hampton Inn, both from room rentals and from other hotel services.

110.    Hilton Defendants generate substantial income from operations of hotels such as the Subject Hampton Inn. In exchange for providing the services described above and more

specifically delineated in the controlling franchise agreement, Hilton received a share of the profits from room rentals collected by Franchisee Defendant at the Subject Hampton Inn. Hilton also profits from reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees. The fees generated by Hilton are primarily based on gross room rentals; therefore, Hilton's profits increase with each room rental to traffickers, including Jane Doe (J.R.L)'s trafficker.

111.    By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Subject Hampton Inn specifically.

112.    In ways described more fully above, Hilton Defendants and Franchisee Defendant knowingly received a financial benefit from participating in a venture, in the form of a continuous business relationship with sex traffickers at the Franchisee Defendant hotel (hereinafter "Venture 1").

113.    Hilton Defendants and Franchisee Defendant formed this continuous business relationship with the traffickers at the Subject Hampton Inn by continuing to rent rooms to traffickers (including Jane Doe (J.R.L)'s trafficker) after Hilton and Franchisee Defendant knew or should have known that the rooms were being used for unlawful trafficking.

114.    This implicit understanding developed because sex traffickers, including Jane Doe (J.R.L)'s sex traffickers, frequently used the Subject Hampton Inn for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of Hilton Defendants and Franchisee Defendant that created a favorable environment for sex trafficking to flourish.

115.    Both Hilton Defendants and Franchisee Defendant participated in this venture by acting jointly to rent rooms to traffickers as further described throughout this pleading. Franchisee Defendant provided "boots on the ground" for reservations, and Hilton directly participated in renting rooms to guests, retained control over reservation systems, and developed and enforced applicable policies and guidelines as further described in this pleading. Each Defendant participated in the venture by continuing to rent rooms to traffickers after they knew or should have known that hotel rooms were being used for unlawful trafficking.

116.    Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced as set forth immediately below, among other things:

a.    These traffickers were familiar to the staff at Subject Hampton Inn;

b.    These traffickers took few or no steps to conceal their activities from the staff at the Subject Hampton Inn but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

c.    Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

d.    Defendants provided additional services to traffickers (including Jane Doe (J.R.L)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

117.    The criminal traffickers operating at the Subject Hampton Inn as part of Venture 1 violated 18 U.S.C. §1591 as to victims trafficked at the hotel, including (J.R.L)

118.    Jane Doe (J.R.L)'s trafficking at the Subject Hampton Inn was a result of each Defendant's participation in Venture 1 with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe (J.R.L)'s trafficking at the Subject Hampton Inn.

119.    In ways described more fully above, Defendants also knowingly received a financial benefit from participating in a commercial venture with one another operating the Subject Hampton Inn (hereinafter "Venture 2").

120.    Hilton Defendants and Franchisee Defendant had a longstanding business relationship pursuant to which they jointly participated in operation of the Subject Hampton Inn with a shared goal of maximizing revenue, including gross room revenue.

121.    Defendants were jointly responsible for customer safety and, specifically, prevention of human trafficking at the Subject Hampton Inn. Hilton Defendants retained control over, and thus had a duty with respect to, customer safety at the Subject Hampton Inn generally and specifically regarding detection of and response to human trafficking at the Subject Hampton Inn.

122.    Venture 2 violated the TVRPA through the widespread sex trafficking at Subject Hampton Inn, including the trafficking of Jane Doe (J.R.L), and through the conduct of Franchisee Defendant which violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

123.    Despite actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Hilton participated in the venture by continuing to associate with Franchisee Defendant to operate the Subject Hampton Inn in a way that Hilton knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (J.R.L) Hilton continued providing Franchisee Defendant with operational support, use of its trademarks, marketing services, and other resources to operate the Subject Hampton Inn in a way that Hilton knew or should have known was engaging in violations of 18 U.S.C §1591(a).

**VI.    Franchisee Defendant Operated as Hilton Defendants' Actual Agents.**

124.    In addition to Hilton Defendants' direct involvement in the venture through the means outlined above, Hilton Defendants participated in the venture through the acts and omissions of Franchisee Defendant, its agent, and the hotel staff, its subagents for the purpose of operating the Subject Hampton Inn.

125.    The Hilton Defendants exercised an ongoing and systemic right of control over Franchisee Defendant regarding the operation of the Subject Hampton Inn.

126.    At all relevant times, Franchisee Defendant was subject to and required to comply with detailed written policies and manuals and other formal and informal protocols, directives, mandates, and expectations imposed by Hilton. These standards, protocols, and requirements:

a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hampton Inn; and

b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishing, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c.  dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hampton Inn; and

d.  significantly exceeded what was necessary for Hilton to protect its registered trademarks.

127.    Hilton Defendants regularly inspected the Subject Hampton Inn.

128.    Hilton Defendants required Franchisee Defendant to adhere to strict requirements, including but not limited to:

      a.   standardized training methods for employees at the Subject Hampton Inn;

      b.   building and maintaining the Subject Hampton Inn in a manner specified by Hilton Defendants;

      c.   standardized or strict rules of operation for the Subject Hampton Inn;

      d.   regular inspection of the Subject Hampton Inn and its operation by Hilton Defendants;

      e.   prices fixed by Hilton Defendants for the Subject Hampton Inn;

      f.   Hilton Defendants provided an online booking platform for the Subject Hampton Inn;

      g.   Hilton Defendants established reporting requirements for the Subject Hampton Inn; and

      h.   other actions that deprived Franchisee Defendant of independence in the business operations of the Subject Hampton Inn.

129.    In addition to the ways described above, upon information and belief, Hilton Defendants exercised and reserved the right to exercise systemic and pervasive control over day-to-day operation of the Subject Hampton Inn in ways including but not limited to the following:

      a.   Hilton Defendants required their staff and management of the Subject Hampton Inn to participate in mandatory training programs, both during onboarding and on an annual basis, regarding all aspects of hotel operations.

      b.   Hilton Defendants retained the right to mandate and control training for hotel staff and actually maintained and controlled training for hotel staff on topics it selected. Hilton required onsite and online training for all hotel staff, including mandatory training for all hotel-based employees at the time of hire and ongoing training as dictated by Hilton.

      c.   Hilton Defendants controlled the details of training conducted for hotel staff by requiring the use of standardized training methods and materials.

      d.   Hilton Defendants set required staffing levels for the Subject Hampton Inn.

e.  Hilton Defendants adopted detailed job descriptions for each position at the Subject Hampton Inn and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so.

f.  Hilton Defendants exercised control over the hiring process for hotel staff by mandating interview techniques, setting hiring criteria, and controlling requirements for background and reference check.

g.  Hilton Defendants retained the right to approve or reject hiring of the general manager of the hotel.

h.  Hilton Defendants imposed and enforced detailed requirements for all aspects of hotel facilities.

i.  Hilton Defendants required that the Subject Hampton Inn use Hilton's preferred vendors to purchase goods necessary for day-to-day operation of the hotel.

j.  Hilton Defendants entered into exclusive purchasing agreements with vendors, including through the Primary Supplier Distribution Program, and required the Subject Hampton Inn to purchase goods and supplies from a single source selected by Hilton. Hilton did not do this solely to assure uniformity of brand but, instead, did this for their own financial benefit as they routinely received rebates from vendors selected through these purchasing agreements.

k.  Hilton Defendants controlled channels for guests to report complaints or provide feedback about the Subject Hampton Inn.

l.  Hilton Defendants required the Subject Hampton Inn to participate in a Guest Assistance Program and retained the right to require the Subject Hampton Inn to take specific actions to resolve guest complaints, including providing rebates and cash refunds.

m.  Hilton Defendants required the Subject Hampton Inn to use systems Hilton owned, operated, and controlled for, among other things, revenue management, hotel operations, and business intelligence gathering and analysis.

n.  Hilton Defendants provided day-to-day services through the back-end operation of the property management system used for virtually all aspects of running the Subject Hampton Inn.

o.  Hilton Defendants required the Subject Hampton Inn to use electronic mail systems maintained by Hilton Defendants, which are maintained, controlled, and monitored by Hilton Defendants.

p.  Hilton Defendants were directly involved in installing hardware and software systems and providing day-to-day maintenance and repair of these systems at the Subject Hampton Inn.

q.   Hilton Defendants controlled all marketing for the Subject Hampton Inn. Hilton Defendants exercised this control on a day-to-day basis by going beyond setting standards and, instead, requiring the Subject Hampton Inn to get prior approval of any marketing or advertising materials.

r.   Hilton Defendants set detailed standards regarding the insurance the Subject Hampton Inn was required to purchase and maintain, including requirements for specific provisions that must be in the policy, who must be insured, in what amount, and what insurers the Subject Hampton Inn could use.

s.   Hilton Defendants imposed detailed recordkeeping and reporting requirements on the Subject Hampton Inn regarding virtually all aspects of hotel operation, including internal operations.

t.   Hilton Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

u.   Hilton Defendants retained the right to inspect the Subject Hampton Inn, including through unannounced inspections, and to perform audits. They inspected and audited virtually all aspects of hotel operations, including internal operations and issues related to guest safety.

v.   Hilton Defendants retained control to require the Subject Hampton Inn to make operational changes within a time established by Hilton.

w.   Hilton Defendants monitored day-to-day operations of the Subject Hampton Inn through constant monitoring of guest surveys, online reviews, customer complaints, and data from the back-end of the systems it required the Subject Hampton Inn to use.

130.   Hilton Defendants specifically retained control over the day-to-day operation of Franchisee Defendant with regard to aspects of operation of the Subject Hampton Inn that caused Jane Doe (J.R.L)'s harm, including but not limited to reservation policies and procedures, staff training, security policies, and training, education polices, and procedure regarding human trafficking.

131.   Hilton Defendants regularly advised Franchisee Defendant on operational changes necessary for it to remain in compliance with Hilton's strict regulations.

132.   Hilton Defendants had the ability to impose fees or fines on Franchisee Defendant. Furthermore, at all material times, Hilton Defendants retained an absolute right to cancel its

franchise agreement with Franchisee Defendant if Hilton's rules were violated or if Franchisee Defendant otherwise failed to comply with its contractual obligations.

133.    At all relevant times, Franchisee Defendant acted as the agent of the Hilton Defendants when operating the Subject Hampton Inn.

134.    Hilton Defendants and Franchisee Defendant shared control of the terms and conditions of the employment of staff at the Subject Hampton Inn and, therefore, the Hilton Defendants and Franchisee Defendant is joint employers. Upon information and belief, Hilton Defendants exercised control over the terms and conditions employment of staff at the Subject Hampton Inn by advertising employment opportunities, making or influencing employment decisions, setting employee wages, and adopting standardized rules of operations that govern the day-to-day work of the employees.

## VII.    Defendants are jointly and severally responsible for the trafficking of Jane Doe (J.R.L)

135.    The Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

136.    Upon information and belief, operation of the Subject Hampton Inn was part of a single unified operation by Hilton Defendants and Franchisee Defendant. Upon information and belief, Hilton Defendants and Franchisee Defendant acted jointly to own, operate, control, manage, and supervise the Subject Hampton Inn. As an integrated enterprise and/or joint venture, Hilton Defendants and Franchisee Defendant are separately and jointly responsible for compliance with all applicable laws.

137.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (J.R.L).

138.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (J.R.L) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

139.    Jane Doe (J.R.L) incorporates all other allegations.

**I.    Count I: Beneficiary Liability under §1595 (a) of the TVPRA. (All Defendants)**

140.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

141.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendant knew or should have known was engaged in a violation of the TVPRA.

142.    **Venture 1:** Through acts and omissions more fully described throughout this pleading, each Defendant received a financial benefit from participating in ongoing business relationship, referred to herein as Venture 1, with the population of sex traffickers, including Jane Doe (J.R.L)'s trafficker, operating at the Subject Hampton Inn. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a.  Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the subject Hampton Inn by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Subject Hampton Inn engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of (J.R.L)

b. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while Jane Doe (J.R.L)'s trafficker was able to rent a secure venue to earn profits by trafficking Jane Doe (J.R.L) Each Defendant participated in the venture by continually renting rooms to Jane Doe (J.R.L)'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Jane Doe (J.R.L)'s trafficking.

c. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (J.R.L), in the rooms of the subject Hampton Inn.

d. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

e. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (J.R.L)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including (J.R.L)). Each Defendant received a financial benefit every time a trafficker rented a room.

f. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (J.R.L)'s trafficking).

143. **Venture 2**: Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating in commercial venture, referred to herein as Venture 2, with the other Defendants operating the Subject Hampton Inn. Each Defendant violated the TVPRA through participation, as a beneficiary, in this commercial venture as follows:

a. This is a commercial venture that resulted from the business relationship Hilton and Franchisee Defendant to operate the Subject Hampton Inn with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at each of the subject hotels, including the trafficking of Jane Doe (J.R.L).

c. Hilton and Franchisee Defendant knew or should have known Venture 2 was engaged in violations of the TVPRA.

    d.   Franchisee Defendant knowingly benefited from this venture by generating revenue directly from operation of the hotel. Hilton knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the hotel, which increased every time a room was rented to a trafficker.

    e.   Franchisee Defendant participated in this venture through its role providing "boots on the ground" at the Subject Hampton Inn. Hilton participated in this venture by (1) continuing the ongoing business relationship despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

## II.    Count II: Vicarious Liability for TVPRA Violations.

144.    Franchisee Defendant acted as the actual agent of Hilton Defendants when operating the Subject Hampton Inn.

145.    In ways further described above, Hilton Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hampton Inn.

146.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

147.    As a result of the relationship between Hilton Defendants and Franchisee Defendant, Hilton Defendants are vicariously liable for the acts of Franchisee Defendant, including at the Subject Hampton Inn. Factors that support this allegation are that Hilton Defendants shared profits, standardized employee training, standardized and strict rules of operations, Hilton Defendants controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Thus, Hilton Defendants retained control, or the right to control, the mode and manner of work contracted for.

148.    As alleged above, Franchisee Defendant is directly liable to Jane Doe (J.R.L) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). Hilton Defendants are vicariously liable to Jane Doe (J.R.L) for those same violations.

149.    Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Hampton Inn, enabled and contributed to the sex trafficking of (J.R.L)

150.    Hilton Defendants are also vicariously liable for the acts and omissions of the staff at the Subject Hampton Inn because Hilton Defendants, together with Franchisee Defendant, acts as the joint employer of these employees because Hilton Defendants and Franchisee Defendant jointly control the terms and conditions of their employment.

## DAMAGES

151.    Hilton Defendants and Franchisee Defendant's acts and omissions, individually and collectively, caused Jane Doe (J.R.L) to sustain legal damages.

152.    Hilton Defendants and Franchisee Defendant are jointly and severally liable for all past and future damages sustained by (J.R.L)

153.    Jane Doe (J.R.L) is entitled to be compensated for personal injuries and economic damages, including:

   a.  Actual damages;

   b.  Direct damages;

   c.  Incidental and consequential damages;

   d.  Mental anguish and emotional distress damages (until trial and in the future);

   e.  Lost earning capacity in the future;

f. Loss of self-esteem and self-worth;

g. Necessary medical expenses;

h. Physical pain and suffering;

i. Physical impairment;

j. Emotional impairment;

k. Unjust enrichment; and

l. Penalties.

154.    Jane Doe (J.R.L) is entitled to exemplary damages.

155.    Jane Doe (J.R.L) is entitled to recover attorneys' fees and costs of court.

156.    Jane Doe (J.R.L) is entitled to pre- and post-judgment interest at the maximum legal rates.

157.    A constructive trust should be imposed on Hilton Defendants and Franchisee Defendant, and the Court should sequester any benefits or money wrongfully received by Hilton or Franchisee Defendant for the benefit of (J.R.L).

## DISCOVERY RULE

158.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.R.L) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

159.    Jane Doe (J.R.L) was subject to continuous trafficking at the Subject Sleep Inn through at least December 2014, which is not more than 10 years before Jane Doe (J.R.L) filed this lawsuit.

160.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Subject Sleep Inn named herein and Defendants' ongoing venture with one another and with criminal traffickers

### JURY TRIAL

161.    Jane Doe (J.R.L) demands a jury trial on all issues.

### RELIEF SOUGHT

162.    Wherefore, Jane Doe (J.R.L) respectfully requests judgment against Hilton Defendants and Franchisee Defendant, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.


Dated: December 31, 2024                    Respectfully submitted,
                                            PLAINTIFF,
                                            By Her Attorneys,

                                            **JUSTICE LAW COLLABORATIVE**


                                            */s/ Kimberly A. Dougherty*
                                            Kimberly A. Dougherty, Esq. (BBO# 658014)
                                            210 Washington Street
                                            North Easton, MA 0256
                                            Tel: (508) 230-2700
                                            Fax: (385) 278-0287
                                            Email: Kim@Justicelc.com

                                            **ANNIE MCADAMS PC**
                                            *(pending pro hac vice)*

                                            /s/ Annie McAdams
                                            Annie McAdams | SBN 24051014
                                            2900 North Loop West
                                            Suite 1130

Houston Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*

**SICO HOELSCHER HARRIS, LLP**

/s/ David E. Harris
David E. Harris | SBN 24049273
Luis O. Sanchez | SBN 24130926
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*lsanchez@shhlaw.com*

*and*


**PROVOST ✶ UMPHREY LAW FIRM**

By: */s/ Bryan Blevins*
Bryan Blevins| SBN 02487300
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Telephone: (409) 838-8813
bblevins@provostumphrey.com

*Attorneys for Plaintiff*